In the Matter of J. J. TYNE and John Caul, co-partners, doing business as Tyne Company, a co-partnership, and John J. Tyne, individually, Bankrupt.

Louis DREYFUSS, Appellant,

v.

S. Harvey KLEIN, Trustee, Appellee.

No. 12183.

United States Court of Appeals Seventh Circuit.

June 23, 1958.

Henry S. Blum, Chicago, Ill., for appellant.

Joseph L. Kadison, William S. Collen, Chicago, Ill., for appellee.

Before FINNEGAN, HASTINGS and PARKINSON, Circuit Judges.

PARKINSON, Circuit Judge.

Prior to adjudication the bankrupt was in the manufacturing business at 3212 West Fillmore Street in Chicago, Illinois. It owned the building at that address and the machinery and other personal property located therein.

The machinery and other personal property was sold by the trustee, pursuant to court order, at an auction sale on April 26 and 27, 1955. It was sold to divers persons with the announced stipulation that the buyer would have until May 14 only to remove the property purchased from the premises. In other words "[t]he period to May 14 was free rental, because it would take that much time to clear the property under the normal auction sale."

Immediately after the sale one Martin J. McGuire, an attorney representing Pennvale Steel & Tube Company, an Illinois corporation, went to the trustee and told him Pennvale wanted to purchase all of the machinery and personal property sold at the auction, enter into a lease for the building and carry on the

same business theretofore conducted by the bankrupt.

Pennvale then arranged with one Samuel Fishman, who had purchased some of the machinery at public auction, to both sell to Pennvale that machinery and to acquire for Pennvale the remaining property from the other successful bidders. Fishman did so "acting as broker for Pennvale Steel & Tube Company."

On May 5, 1955 Fishman called the trustee and said he was coming over with McGuire. When they arrived McGuire asked the trustee if he could rent the building and the trustee said he would have to obtain a court order. There was talk about custodian fees and McGuire agreed to pay for the custodians.

A Mr. Adolph Winternitz, who conducts his own auction business, told one Louis Dreyfuss about "a loan which looked very attractive." The loan would be to Pennvale to enable it to complete the purchase of the machinery from Fishman. Winternitz took Dreyfuss to the building at 3212 West Fillmore Street in Chicago on May 23rd or 24th 1955 to show him the machinery that was to be used for security. The business was not operating. The door was open and there was a custodian there. Dreyfuss dealt with a Mr. Schwartz and his attorney McGuire representing Pennvale. Dreyfuss was told that Pennvale needed the money to acquire a few more machines and was going to operate the plant.

On May 26, 1955 Dreyfuss made a loan of $30,500 to Pennvale and Pennvale executed a chattel mortgage on the machinery. Dreyfuss paid Pennvale $25,000. The balance of $5,500 was retained by Dreyfuss. It was the amount it cost Pennvale to get the loan from Dreyfuss. The chattel mortgage was recorded on June 7, 1955 in compliance with the law of Illinois.

Pennvale defaulted and on September 2, 1955 Dreyfuss, under the provisions of the mortgage, declared the entire amount due and attempted to take possession of the property described in the mortgage. The trustee refused Dreyfuss

possession claiming a lien on the property of approximately $7,000 for custodian charges.

To obtain possession and make sale of the property under the defaulted mortgage Dreyfuss, on September 2, 1955, entered into a written stipulation running to the trustee. Dreyfuss agreed thereby that if the sale did not yield sufficient money to satisfy both the mortgage and the trustee's claim Dreyfuss would deposit a sufficient amount to satisfy the trustee's claim. The stipulation and deposit was subject to the order of Wallace Streeter, Referee, without prejudice to the contention of Dreyfuss that the trustee had no lien. Dreyfuss stated therein with reference to the trustee that: "You, at this time, have your custodians in possession of the said property."

Subsequently, on October 20, 1955, Dreyfuss deposited $7,000 with the trustee pursuant to the stipulation.

On February 17, 1956 Dreyfuss filed his petition praying for an order directing the trustee to turn over to him the $7,000. Issues were formed by answer and counter-claim and the proceedings were heard by the referee, who made rather detailed findings of fact and entered an order directing the trustee to retain $5,316.85 of the $7,000 and pay the balance of $1,683.15 to Dreyfuss.

Dreyfuss filed a petition for review. The District Court affirmed the order of the referee and this appeal followed.

The uncontradicted evidence clearly establishes a valid and binding contract between Pennvale and the trustee for the storage of the machinery, after May 15, 1955, in the building owned by the bankrupt estate with Pennvale to pay the cost of custodians to protect the machinery.

On May 5, 1955 Fishman was the owner of some $12,000 of the machinery which he purchased from the trustee at the auction in April. He had contracted to sell this to Pennvale and was acting as the agent and broker for Pennvale in acquiring title for the remainder from the other auction sale purchasers. McGuire

**312**

was the attorney for Pennvale and represented that corporation in the entire transaction. McGuire and the trustee, in Fishman's presence, discussed details for renting the building. Pennvale wanted to keep the machinery in the building until court approval of the lease could be secured and the trustee "could turn possession over to the Pennvale Steel & Tube Company". Until such time the trustee "had expenses running such as custodian fees, light and so forth, that those expenses would have to be paid." McGuire, acting on behalf of Pennvale in the presence of Fishman, the agent and broker of Pennvale, agreed to pay such "expenses for custodian fees and watchmen".

The only question here is whether the referee correctly held that Dreyfuss, the mortgagee, was liable. Our answer to that question is in the affirmative.

Section 62, sub. a of the Bankruptcy Act, 11 U.S.C.A. § 102, sub. a provides for the payment of costs and expenses out of the estate in which they were incurred with one very important exception, that is "where other provisions are made for their payment." Such provisions may be made by voluntary agreement but more frequently are those imposed by the court in the exercise of its statutory and equitable powers.

Into this latter category falls the much litigated question of what, if any, administrative expenses are chargeable to a lienholder. A lienholder normally should not be charged with administrative expenses. However, where expenses are incurred that primarily benefit the lienholder such expenses should be allocated to him in the proportion to the benefit he derives therefrom. When a lienholder alone derives the benefit then he alone should bear the expense. Collier on Bankruptcy, 14th Edition, 62.03 pp. 1397, 1398. To hold otherwise would be to compel general creditors to pay costs and expenses not incurred for their benefit but solely for the benefit of a third person.

The building in which the machinery was housed was owned by the bankrupt estate. In re Tyne, 7 Cir.,

1956, 234 F.2d 907. Absent permission of the trustee, Pennvale had to remove the machinery by May 14, 1955. Pennvale, by its attorney McGuire, made arrangements with the trustee to keep the machinery in the building after May 14, 1955 pending court approval of a lease of the building to Pennvale. In the interval Pennvale agreed to pay the expense of the custodians and made a good faith deposit of $750. Court approval of the lease was never procured because of the failure of Pennvale to secure the necessary insurance.

The trustee complied with his agreement. He furnished 24 hour a day custodian service for the protection of the machinery. From the evidence it is apparent what would have happened to the machinery without such custodian service. After Dreyfuss sold the machinery under his mortgage and the custodians were discontinued the plumbing, heating, wiring and electric panels inside the building were seriously damaged by vandalism.

The bankrupt estate made no profit on the transaction. It was certainly entitled to be reimbursed for the money paid out to preserve and protect the machinery from loss or damage while Pennvale and Dreyfuss left it in storage in the building owned by the bankrupt estate. It was through this custodian service that the security for the mortgage lien of Dreyfuss was preserved and protected from damage.

It is well established that unless the findings of the referee upon which he based his order and judgment, as affirmed by the District Court, are clearly erroneous the order and judgment must be affirmed on appeal. In re Garden City Brewery, Inc., 7 Cir., 1953, 208 F.2d 377, 379; In re Holzapfel's Sons, Inc., 7 Cir., 1957, 249 F.2d 861, 364.

The referee found that the trustee had a valid claim against Louis Dreyfuss for the cost of the custodian services, less the $750 paid by Pennvale on May 5, 1955. This and all the other related findings of fact are adequately supported by the evidence.

We do not reach the question as to whether the trustee had a common law or statutory lien on the machinery paramount to the mortgage lien of Dreyfuss. Basic principles of equity chart a clear course here.

We, therefore, hold that the referee arrived at the correct result and the judgment of the District Court affirming the order and judgment of the referee is

Affirmed.